SAFE DEPOSIT AND TRUST COMPANY OF BALTIMORE, EXECUTOR OF WILL OF HENRY WALTERS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 77674.   Promulgated January 15, 1937.

*Charles McH. Howard, Esq.*, for the petitioner.
*R. P. Hertzog, Esq.*, for the respondent.

260

OPINION.

STERNHAGEN: 1. The petitioner seeks a determination in this proceeding that it is free from any "personal liability" which might be asserted under the Revised Statutes, § 3467,[1] because, acting under the Revenue Act of 1926, section 313 (b),[2] it made written applica-

---

[1] Every executor, administrator, or assignee, or other person, who pays any debt due by the person or estate from whom or for which he acts, before he satisfies and pays the debts due to the United States from such person or estate, shall become answerable in his own person and estate for the debts so due to the United States, or for so much thereof as may remain due and unpaid.

[2] If the executor makes written application to the Commissioner for determination of the amount of the tax and discharge from personal liability therefor, the Commissioner

tion to the Commissioner for the determination of the estate tax and discharge of its personal liability. The entire record in this proceeding establishes clearly that the deficiency has been determined against the estate and notice thereof sent to the petitioner in its representative capacity as executor. It has not been suggested by either party (except in the apprehension of petitioner) that the Commissioner is using this proceeding to establish personal liability upon the petitioner for any deficiency which may be finally determined. Cf. *Hulburd* v. *Commissioner*, 296 U. S. 300; *DeForest Hulburd, Executor*, 27 B. T. A. 1123. In this proceeding, brought by the executor in its representative capacity, to determine a deficiency of the estate of which notice has been sent by the Commissioner to the executor in such representative capacity, the Board is confined to the redetermination of the deficiency, and may not consider the question whether the executor is, under the Revised Statutes, § 3467, "answerable in his own person and estate." *Newton H. Neustadter, Executor*, 15 B. T. A. 839. Cf. *Rodenbough* v. *United States*, 25 Fed. (2d) 13, 18; *United States* v. *Rodenbough*, 21 Fed. (2d) 781, 785.

2. The first and principal matter in controversy is the amount to be included in the gross estate under the Revenue Act of 1926, section 302, as the value at the time of death of property consisting of shares of stock in four corporations, namely, 35,966 shares of Atlantic Coast Line Railroad Co., 104,663 shares of Atlantic Coast Line Co. of Connecticut, 1,000 shares of Safe Deposit & Trust Co. of Baltimore, and 3,000 shares of Wilmington Savings & Trust Co. As to the Wilmington Savings & Trust Co. shares, the record is without evidence as to their value, and for this reason, as petitioner in its proposed findings admits, no finding can be made that the value of these shares is other than $105,000, as the Commissioner determined.

(a) The petitioner, in its return, included in the gross estate, as the value of the 35,966 Railroad Co. shares, $1,078,980, which was arrived at upon a unit valuation of $30 per share. The Commissioner, after audit and negotiation, determined the value of these shares at date of death to be $1,582,504, a unit value of $44 per share. The issue is whether, from the evidence in this record upon this question of fact, it is established that the Commissioner's determination is in error, and, if so, what the preponderance of the evidence establishes as the correct value of the shares.

The Commissioner's determination was based upon the fact that on the date of death the shares were listed on the New York Stock

(as soon as possible, and in any event within one year after the making of such application, or, if the application is made before the return is filed, then within one year after the return is filed, but not after the expiration of the period prescribed for the assessment of the tax in section 310) shall notify the executor of the amount of the tax. The executor, upon payment of the amount of which he is notified, shall be discharged from personal liability for any deficiency in tax thereafter found to be due and shall be entitled to a receipt or writing showing such discharge.

Exchange and that several sales occurred on that day in the aggregate of 600 shares at various prices between 45 high and 43 low. Upon this fact, the Commissioner, in accordance with his Regulations 80, article 13, took the mean price of the day as 44 and treated this as the unit value per share, thus giving the total value of $1,582,504. The petitioner criticizes this as a formalistic mathematical method which in this instance is at variance with reality, primarily because it leaves out of account the paramount circumstance that the block of its shares consisted of 35,966 shares and that the valuation of this large number of shares involves considerations and factors different from those applicable to the unit daily mean market price resulting from a few 100-share transactions. To this end, it introduced the testimony of witnesses with various kinds of experience, to prove that in fact the sale of 35,966 shares could not be accomplished as readily or simply as the sale of 100 or 600 shares, and that both the seller and the purchaser would make a different investigation before a price, or an aggregation of prices could be arrived at. The Commissioner, on the other hand, submitted the testimony of an investment counselor of experience and learning who made an analysis of what were, in his opinion, the considerations affecting the value of a block of stock of this size, and arrived at the conclusion that, since each share must be of the same value as every other share of the same kind, the unit price of 100 or 600 shares sold correctly represented the unit price of all such shares, irrespective of the number in any block. There was evidence that in all probability the New York Stock Exchange would not have permitted such a large block to be offered for sale on one day, and that if it had the price would have thereby been instantly depressed; that a sale not on the Exchange might have been possible to a capitalist or an investment trust or corporation, but that the stock could only have been sold publicly by "feeding" it out in small lots over a period of time; that such a period might cover several months, since in fact it was three months after the date of death before the accumulation of sales of similar stock on the Stock Exchange reached 33,000 shares. Exhibits, some of petitioner and some of respondent, show by tables and charts that over a substantial period of time the earnings of the Railroad Co. and the Stock Exchange prices of its shares were declining and would probably continue to decline, and it was testified that one contemplating a transaction involving 35,966 shares would surely not ignore this, as might one engaged in a casual Stock Exchange transaction of a small block.

The evidence demonstrates to a reasonable assurance that the Commissioner's method, while it has the administrative advantage of certainty, does not, as to this block of shares, result in a figure

which is consistent with reality. It seems clear that the unit figure of 44 is too high and can not be sustained. A lower figure must be found from the evidence, however difficult it may be to find one. That there is room for a flexible judgment as to the point at which supposititious willing buyers might agree with this seller, should not paralyze the function of deciding. *Cohan* v. *Commissioner*, 39 Fed. (2d) 540, 543; *Bryant* v. *Commissioner*, 76 Fed. (2d) 103, 105; *Clinton Cotton Mills, Inc.* v. *Commissioner*, 78 Fed. (2d) 292, 295. A reasonable figure must be fixed within the bounds of the evidence, and if it be not arbitrary it is not important that it can not be rationalized beyond every logical objection. *Baltimore & Ohio R. R. Co.* v. *Commissioner*, 78 Fed. (2d) 460, 465; *Hummel-Ross Fibre Corporation* v. *Commissioner*, 79 Fed. (2d) 474, 478.

On November 30, 1931, the history of the Railroad showed steadily declining earnings, from the end of 1929 at about $15 per share, to less than $10 on the date of death. The stock prices had been going through a general decline, with occasional short spurts upward, since the middle of 1931, when in July it was in the 90's, in September in the 70's, in October in the 60's and 50's, until at the date of death it was, as has been seen, 43–45. Since, as the evidence shows, this performance was embedded in the general economic depression which was at that time well known and widely felt, there was no reason for belief that the downward trend had reached its end, so that stocks which could only be sold piecemeal over a substantial period would continue to command the price of that day. With the information at hand on that day which is present in this record, one could not reasonably have expected to realize for the entire 35,966 shares to be sold during the forthcoming months an average price reflected by a curve projected in any other than the general downward direction which it had taken in the recent past.

In our opinion, the value of the 35,966 shares of Atlantic Coast Line Railroad Co. stock on November 30, 1931, was not more than $35 per share, or $1,258,810, and this value has been found as a fact.

This conclusion has not been arrived at by any dogmatic recognition or nonrecognition of any so-called "blockage" rule, i. e., that a large block of shares of one kind is *ipso facto* to be valued with or without relation to the value of one share in a smaller block. "Blockage" is not a law of economics, a principle of law, or a rule of evidence. If the value of a given number of shares is influenced by the size of the block, this is a matter of evidence and not of doctrinaire assumption. See *James Couzens*, 11 B. T. A. 1040, 1161; *T. B. Hoffer*, 24 B. T. A. 22; *Laird* v. *Commissioner*, 85 Fed. (2d) 598; *Rogers* v. *Strong*, 72 Fed. (2d) 455; *William S. Gordon, Trustee*, 33 B. T. A. 460; *St. Louis Union Trust Co. et al., Trustees*, 30 B. T. A. 370, 381; *Frank*

*J. Kier et al., Executors*, 28 B. T. A. 633. Whatever force the Commissioner's regulations (article 13) may have during the consideration of the matter in the stages before litigation in the Board or the courts, it can not lay down a controlling rule of evidence in such litigation, *Second National Bank of Philadelphia*, 33 B. T. A. 750, 755.

(b) The gross estate included 104,663 shares of Atlantic Coast Line Co. of Connecticut, which was an investment corporation the greater part of the assets of which consisted of securities of the Atlantic Coast Line Railroad Co. Its shares were listed on the Baltimore and Richmond Exchanges, but were dealt in very infrequently. On the Baltimore Exchange the price was "pegged" from September 25, 1931, to February 2, 1932, at the September 25 price of 68. There was a sale on the Richmond Exchange of 27 shares on November 24, 1931 (6 days before the death of decedent), at 44, and there was a sale of 8 shares on December 7 (7 days after death), at 30. Since the regulations, article 13, prescribe that the price at the nearest date be used, the Commissioner took $44 as the unit price and thus determined a value of $4,605,172. The petitioner, in its return, used a unit price of $30 and a total of $3,139,890. Both sides, it will thus be seen, have used the same unit figure per share for the Connecticut Co. shares as for the Railroad Co. shares. There is testimony and argument on the subject of the relation between the two, but it seems to elude satisfactory rationalization. There is in the record evidence enough to show that the parity of values which both sides have adopted is fair and reasonable. Thus the finding has been made of a total value of the 104,663 Connecticut Co. shares of $3,663,205, at the same unit figure of $35 as has been used for the Railroad shares. This unit figure also reflects, apart from any relation with the Railroad shares figure, a reasonable point in the downward trend of the value of the Connecticut Co. shares which one might be expected to consider in arriving at a price.

(c) The gross estate included 1,000 shares of Safe Deposit & Trust Co. stock, the value of which the petitioner included in its return at a rate of $550 and the Commissioner determined at a rate of $635 per share. The shares were not listed, and actual transactions had occurred in small lots at prices which were gradually declining from $695 early in October to $590 and $600 shortly after the death. No early rise was then reasonably in prospect. Both sides agree that as to this sort of stock book value is not significant. Upon all the evidence in the record, the finding has been made that the value at the date of death was at the rate of $600 per share, or an aggregate value of $600,000.

(3) The subject of deductibility, as claims against the estate, of outstanding amounts of subscriptions made by a decedent during his

life to charitable organizations has been dealt with in prior decisions, and needs no further general discussion. *Jeptha H. Wade, Jr., et al., Executors,* 21 B. T. A. 339; *Frances Plumer McIlhenny et al., Executors,* 22 B. T. A. 1093; *David A. Reed et al., Executors,* 24 B. T. A. 166; *Robert A. Taft, Executor,* 33 B. T. A. 671, 678, 679 (on review C. C. A., 6th Cir.); *Margaret Day et al., Executors,* 34 B. T. A. 11 (on review C. C. A., 3d Cir.); *Maude L. Porter et al., Executors,* 34 B. T. A. 798 (on review C. C. A., 2d Cir.); *Edna F. Hays et al., Executors,* 34 B. T. A. 808; *Turner* v. *Commissioner,* 85 Fed. (2d) 919 (C. C. A., 3d Cir.); *Glaser* v. *Commissioner,* 69 Fed. (2d) 254 (C. C. A., 8th Cir.); *Porter* v. *Commissioner,* 60 Fed. (2d) 673 (C. C. A., 2d Cir.); affd., 288 U. S. 436; *Latty* v. *Commissioner,* 62 Fed. (2d) 952 (C. C. A., 6th Cir.); *Bretzfelder* v. *Commissioner,* 86 Fed. (2d) 713. The evidence shows that the $30,000 pledge to the Emergency Unemployment Relief Committee of New York was made in consideration of subscriptions of others, and it may therefore be regarded as based on an "adequate and full consideration in money or money's worth", *Jeptha H. Wade, Jr., et al., Executors, supra.* The claim of $24,000 is therefore a proper deduction. The consideration for the other three subscriptions is not so shown, and from the evidence it appears that the promises were entirely voluntary, or, if legal obligations, cf. *Gittings* v. *Mayhew,* 6 Md. 114, were not supported by consideration of money or money's worth. They are not deductible. *Robert A. Taft, Executor, supra.* The claim of petitioner in the alternative, that these pledges should then be included in the value of the residuary estate for the purpose of computing the fraction to charity, is without support and must be rejected.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

